CASE NO. 24-1410

IN THE UNITED STATES COURT OF APPEALS FOR

THE TENTH CIRCUIT

UNITED STATES OF AMERICA,   )
              )
   Plaintiff-Appellee,   )
v.             )
              )
DAVID LYTLE,       )
              )
   Defendant-Appellant   )
              )

---

On Appeal from the United States District Court for
the District of Colorado
The Honorable Ray Moore, District Judge
D.C. No. 1:21-CR-192-RM-1

---

**APPELLANT'S OPENING BRIEF**

---

MORGAN PILATE LLC  Melanie S. Morgan
926 Cherry Street
Kansas City, MO 64106  Attorney for Appellant
Tel: 816-471-6694    David Lytle
Fax: 816-472-3516
e mmorgan@morganpilate.com

ORAL ARGUMENT IS REQUESTED

i

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ......................................................................iv

**PRIOR OR RELATED APPEALS** ............................................................1

**JURISDICTION** ........................................................................................2

**ISSUES** .......................................................................................................2

**STATEMENT OF THE CASE** ...................................................................4

    **A. Background** ...................................................................................6

        1. The Direct Mail Industry .....................................................6

        2. Epsilon's Product ..................................................................7

        3. The Process by which Epsilon Sold Data ............................8

        4. The Cast of Characters .......................................................10

    **B. The Investigation** .......................................................................13

    **C. Evidence Regarding Specific Mailers** .......................................15

        1. Destiny Research Center (Count 1) ...................................15

        2. Registered Disbursement Division (ESC, CDS) (Counts 2, 3, 14-19).......16

        3. Gold Rush (Count 4)...........................................................17

        4. Email (Count 5) ...................................................................18

        5. Diamond Dollars (Count 7) ...............................................18

        6. JKS Ventures (Counts 1,6,10).............................................19

        7. Palm Beach (Count 9) .........................................................20

        8. National Consumer Division (Counts 1, 8, 12, 13)............20

        9. Live Tree (Count 11) ...........................................................21

**SUMMARY OF ARGUMENT** ..................................................................22

**ARGUMENT** .............................................................................................24

    **A. Sufficiency of the Evidence** .......................................................24

    **B. Legal Background** .......................................................................26

        1. Mail and Wire Fraud ...........................................................26

        2. Conspiracy ...........................................................................27

        3. Liability as a principal, aider and abettor .........................28

    **C. Gaps in the evidence as to wrongdoing on the part of certain Epsilon clients caused the jury to engage in speculation and conjecture based on unsubstantiated accusation, affiliation and association.** ...................................28

        1. Creatives from "opportunity seeker" mailers, even if shady, lacked objective evidence demonstrating a scheme to defraud where there was no evidence as to the truth or falsity of the statement or the intent behind the making of it. ...........................................................................32

        2. Lytle's prior employment with a direct mailer was used to insinuate that Lytle had knowledge of fraudulent activity even though there was no evidence that Next-Gen was engaged in wrongdoing.......................................36

3.    Awareness of some opportunity seeker mailers facing legal issues is not sufficient to infer that all opportunity seeker mailers were engaged in fraud. 40

4.    Relationships with others at Epsilon and in the direct mail industry is insufficient to permit an inference of knowledge. ................................................. 41

**D.   Issue One:  Was the evidence sufficient to show that Lytle knew that RDD was engaged in a scheme to defraud at the time he signed them in August 2013?** ................................................................................................................ 44

1.    Registered Disbursement Division (Counts 2, 3, 14-20) ............................ 44

**E.   Issue Two: Absent direct evidence that a mailer engaged in fraud, did inferences drawn from the mail pieces and accusations against other business entities amount to conjecture and speculation that there was a scheme to defraud and that prior to signing any client, Lytle had the requisite advance knowledge to infer his intent?** ................................................. 45

1.    Gold Rush (Count 4) ................................................................................ 45
2.    Email Referencing the Canadian Processor and Brokers (Count 5) ......... 47
3.    JKS Ventures (Count 6, 10) ..................................................................... 47
4.    Diamond Dollars (Count 7) ..................................................................... 49
5.    Palm Beach (Count 9) ............................................................................. 52
6.    National Consumer Division (Counts 8, 12, 13) ...................................... 52

**F.   Issue Three: The evidence is insufficient to establish that Lytle knew someone previously in trouble intended to engage in fraud.** ........................... 55

1.    Live Tree (Count 11 email) ..................................................................... 55

**G.   Issue Four: Where Lytle had no duty to evaluate the promotional material nor the client, and absent knowledge that clients were engaged in a scam, is his conspiracy conviction a result of speculation and conjecture?** ... 56

**CONCLUSION** .................................................................................................... 58

**STATEMENT REGARDING ORAL ARGUMENT** ............................................. 59

**CERTIFICATE OF COMPLIANCE** .................................................................. 60

**CERTIFICATE OF SERVICE** ........................................................................... 60

**ATTACHMENTS:**

Judgment (Supp.R1.1082) …………………………………..…………….Attachment A

Oral denials of Rule 29 Motion (Supp.R9.1584-86, Supp.R9.1958)…..Attachment B

# TABLE OF AUTHORITIES

**CASES**

*Rosemond v. United States*, 134 S.Ct. 65, 71 (2014) ........................................29

*United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993) .....................25

*United States v. Austin*, 786 F.2d 986, 988 (10th Cir. 1986) ..........................28

*United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983) ..............................43

*United States v. Briggs*, 592 U.S. 69, 72 (2020) ...............................................50

*United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992)............................33

*United States v. Goldesberry*, 128 F.4th 1183, 1192 (2025) .............................26

*United States v. Goodman*, 984 F.2d 235 (1993) ..................................27, 48, 50

*United States v. Hanson*, 41 F.3d 580, 583 (1990) ...........................................27

*United States v. Hollis*, 971 F.1d 1441, 1448 (10th Cir. 1992).........................49

*United States v. Michel*, 446 F.3d 1122, 1127-28 (10th Cir. 2006) .................25

*United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000).......25, 28

*United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013)....................25, 45

*United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003).........................26

**STATUTES**

18 U.S.C. 1291 .......................................................................................................2

18 U.S.C. 3231 .......................................................................................................2

18 U.S.C. 3742 .......................................................................................................2

**PRIOR OR RELATED APPEALS**

*United States v. Robert Reger*, Case No. 24-1411, is a closely related appeal as

Mr. Reger and Mr. Lytle were codefendants in the underlying criminal case.

**JURISDICTION**

The district court had jurisdiction over this federal criminal case under 18

U.S.C. 3231.  Final judgment was entered on October 3, 2024. R1.1082[1]. Lytle filed

his notice of appeal 14 days later, which was timely under

Fed.R.App.P.4(b)(1)(A)(i).  R1.1091. This Court has appellate jurisdiction under

18 U.S.C. 1291 and 18 U.S.C. 3742.

**ISSUES**

1. As to Counts 2, 3, 14-20, whether the evidence is sufficient to show that
   Lytle knew that mailer RDD was engaged in a scheme to defraud at the
   time he signed the client in August 2013?

2. Absent direct evidence that a mailer was engaged in a scheme to defraud,
   did inferences drawn from the evidence amount to conjecture and
   speculation that there was a scheme to defraud or that Lytle had the
   requisite advance knowledge to infer his intent, necessitating reversal of
   Counts 4-13?

3. As to Count 11, whether the evidence is sufficient to establish knowledge of
   someone engaging in a scheme to defraud based on them previously facing
   legal trouble.

---

[1] "R1" indicates the volume of the record on appeal, and ".1" indicates the page number of that volume.
Supplemental volumes are referred to as Supp.R9 (trial transcript) and Supp.R10 -21 (exhibit volumes).
Exhibits are identified by exhibit number.  For example, Exhibit 1 is referred to as Supp.R10.Exh.1.

4.  Where Lytle had no duty to evaluate the promotional material nor the client, and absent knowledge that specific clients were engaged in a scam at the time of his actions, is his conspiracy conviction a result of speculation and conjecture?

## STATEMENT OF THE CASE

Advertising connects the seller with the would-be buyer, with the goal of influencing their behavior.   Not all products or services will appeal to all consumers so a promotion is most successful when it is directed toward someone more likely to make a purchase.  Direct mail promotions are one form of advertising and are at the core of this criminal case.

In September 2016 press releases, the Department of Justice identified direct mailers, list brokers and a payment processor that it alleged were involved in fraudulent sweepstake and astrology mailings, and the civil remedies and criminal charges being pursued against the wrongdoers.  Supp.R9.210; R.10.203, Exh.13.  A few months later, the government turned its attention to Epsilon Data Management (Epsilon), a multi-million dollar marketing company that sold names and addresses of potential consumers to some of the marketers it was investigating.  Supp.R9.96, 205.

An Epsilon vice president who oversaw sales was charged first.  Cooperation plea agreement in hand, the government next charged his boss Robert Reger, and his subordinate David Lytle with conspiracy to commit mail and wire fraud by causing Epsilon to provide data to businesses they knew were engaged in fraudulent conduct as well as substantive mail and wire fraud counts

based on the alleged schemes to defraud of 7 different mailers[2]. R1.318, 326. Those mailers include Destiny Research Center, Registered Disbursement Division (RDD), Gold Rush, JKS Ventures, Diamond Dollars, JKS Ventures, National Consumer Division (NCD), Palm Beach and Live Tree. Mail pieces were alleged to be false and deceptive. As to sweepstakes mail pieces, it was alleged "These mail pieces falsely appeared to be personalized, formal communications from a government agency, law firm, or other official entity. The form, content, and structure of the mail pieces deceived some consumers into believing they had won a substantial sum of money, usually in a sweepstakes or other contest of game, but that, in order to claim the winnings, recipients first had to pay a fee, tax, or other sum." R1.897.

Astrology mail pieces were false and deceptive because they "…falsely led consumer recipients to believe they had been specially selected to receive the mail pieces because an astrologer or psychic had experienced a vision about them and would provide personalized information about them or purportedly unique items for a fee." Supp.R1.897.

---

[2] The Superseding Indictment charged 27 counts against Lytle; the government proceeded to trial with 20. Supp.R1.318. The jury received a copy of the Superseding Indictment in the instructions. Instruction 16 contains the 20 counts the jury considered. Supp.R1.894. The counts were renumbered for consideration by the jury; Instruction 16 and the verdict form list 20 counts numbered consecutively and omitting the dismissed charges. Supp.R1.894. The Judgment, however, identifies the counts that Lytle was convicted of based on the Superseding Indictment. Supp.R1.1082. All references to counts in this brief refer to the counts as identified in Instruction 16 as that is the way it was presented during trial, in the instructions and on the verdict form.

Lytle was charged with substantive wire fraud counts reflected in shipments of data by Epsilon employees to various entities and email communications between Lytle and others. Supp.R1.903-905. Lytle was also charged with mail fraud which reflected checks sent by four individuals to RDD or related entities. Supp.R1.905-906.

Lytle was Epsilon's business development manager responsible for signing or attempting to sign several of the named entities alleged to be engaged in fraud. Evidence as to each entity is traced as concisely as possible. But first, to understand the evidence, it helps to understand the direct mail industry, the product Epsilon sold, the process by which it sold it, and the cast of characters. Additional detail is added as necessary in the argument section that follows.

A. Background

1. The Direct Mail Industry

A direct mail campaign puts information about the product or service marketed into the hands of a consumer through a mailed promotional piece. For that to happen, companies must be formed, copy must be created, printed and mailed, names and addresses of recipients purchased. Supp.R9.139. A post-office box or private mailbox designated for responses that are then divided into those that contain funds and those that do not. Supp.R9.143-144. Data must be entered. Checks must be processed and orders fulfilled. Supp.R9.144. If a

sweepstakes is involved, payment must be made.  List brokers provided the
names and addresses of potential customers to their clients.  Supp.R9.150.
Epsilon was a source of names for brokers and mailers.  Supp.R9.151.

   2.  Epsilon's Product

   Abacus was a data cooperative which housed transactional data (purchase
data) from approximately 100 million households. Supp.R9.92, 461.   Companies
contributed their customer information and through modeling, Epsilon sold
clients data designed to reach consumers most likely to purchase their product or
service.  Supp.R9.93.   Using a spend-a-like concept – targeting consumers based
on their known spending habits – enabled companies to find "now" customers or
who they should be marketing to again R9.463.  Abacus data was used in a wide
variety of capacities including non-profit, catalogue, publishing, business-to-
business and direct-to-consumer (DTC).  Supp.R9.463.

   The DTC unit sold to direct mail clients marketing in several categories
including vitamins and supplements, coins and collectibles, opportunity seekers,
senior living, senior hard goods, food delivery companies, and exercise
companies. Supp.R9.472. Among the more familiar brands were Champion
Windows, Nespresso, Schwan Foods, Stanley Steamer and Fabletics.
Supp.R9.892.   Sweepstakes and astrology mailers fell into the opportunity
seekers category. Supp.R9.204.  Opportunity seeker clients comprised decreasing

7

percentages of revenue over the years. Supp.R9.472.  In 2016, it made up 13 percent.  Supp.R9.528.   All clients were assigned an MRC code; 67 was the MRC code assigned to opportunity seekers.  Supp.R9.258; Supp.R10.Exh.11.  Each Epsilon client at issue fell into this category.

3.   <u>The Process by which Epsilon Sold Data</u>

The relationship between Epsilon and its clients was contractual and before data – the names and addresses – could be shipped, both the client and Epsilon had to agree to the terms.  Supp.R9.828, 962.  Standardized in form, it was subject to changes only with the approval of Epsilon's legal department. Supp.R9.826. The Master Services Agreement governed the relationship between the client and Epsilon. Supp.R9.900. Among the provisions was that the data could only be used one time. Supp.R9.827.  And a Direct Marketing Association-recommended provision that required compliance with applicable laws and DMA guidelines. Supp.R9.1637

Other documents included a Statement of Work ("SOW"), a broker referral form, and the sample promotional material, and the new client information. Supp.R9.903.  The purpose of the promotional material was for categorization. Supp.R9.536, 903.  The SOW provided "represents and warrants that neither client's collection nor client's or Epsilon's use or disclosure of the client data as contemplated by this agreement has violated or will violate any applicable law,

rule, regulation, DMA guideline, the rights of any third party, or any applicable privacy policy." Supp.R9.1727; Supp.R21. Exh.Y08.  Once all information was collected, it was uploaded into Salesforce. Supp.R9.904.  The executive signing the contract had a copy of the promotional piece. Supp.R9.816, 825.  The contracting process was the same for every client. Supp.R9.1127.

Business Development Managers were responsible for signing up clients. That involved submitting the forms to the client, obtaining signatures, and collecting the creative.  The BDM obtained the MRC code, sent the pre-assignment to the account executive (salesperson), and set up the onboarding call which transitioned the client to the sales team.  These tasks and others were outlined on the BDM checklist.  Supp.R9.1702; Supp.R21.Exh.Z74.  Another employee facilitated making sure the contracts were signed.  Supp.R9.905. Data acquisition obtained the data from the clients.  Account Executives handled the sales and day-to-day contact, building the client relationship to try to get them to buy as many names as possible through understanding their mail activity. Supp.R9.478-479.

DTC clients were required to submit a sample promotional mail piece, known as a "creative" with their signed contract. Businesses assigned to the opportunity seekers category were no different.   Numerous creatives were

introduced during trial. Supp.R9.274. Those located in Lytle's One Drive were summarized in Exhibit 404. Supp.R10.164, Exh.404.

There were no creative guidelines for Abacus co-op sale data, although there were guidelines for other Epsilon products. Supp.R9.563. And no process for evaluating creatives. Supp.R9.551. Sexually explicit creatives referred to as male potency offers were subject to some review toward the end of 2015. Supp.R9.551, 553.

4. <u>The Cast of Characters</u>

a. *<u>Epsilon Employees</u>*

i. <u>Business Development Managers</u>

David Andrews and David Lytle were the BDMs assigned to the DTC. Supp.R9.494, 462. Lytle was hired by Fritz Kessler, Vice President of Sales, in 2012 and for part of his time there, he was managed by him. Beginning in 2016, he was managed by the Vice President of Business Development although he continued to report to Kessler. Supp.R9.493. Lytle worked from his home in Kansas City. Supp.R9.487.

ii. <u>Sales Team</u>

The account executives were supervised by Kessler and handled the direct sales with client mailers. Supp.R9.477. No account executive testified.

iii. <u>Management</u>

10

As Vice President, Kessler oversaw approximately 9-11 employees in the DTC. His responsibilities included sales forecasting, supporting his team internally and helping with client challenges. Supp.R9.476. Although Epsilon did not have a creative review process, Kessler was tasked with reviewing potency mail pieces. Supp.R9.566. Kessler pled guilty to conspiracy to commit mail fraud with an agreement to cooperate. He admitted that he was part of the process of approving clients to work with Epsilon and receive names from Epsilon and knew that at least one client – NCD - had misleading promotional letters. Supp.R9.503.

Over the years Reger had several roles at Epsilon and its predecessor companies, including account executive, new business development manager, vice president and lastly, senior vice president. Supp.R9.462. The DTC was one of six units under his umbrella. Reger supervised Kessler. Reger was tasked by Stacey Hawes, his boss, with working with the legal team and responding to the government's inquiry. Supp.R9.1323. Reger left the company in March 2017 and went to work for a competitor. Supp.R9.246. Reger did not testify.

Hawes was President/CEO of the Data Practice Group. She was the primary executive who, upon receiving the contracts and the creatives, signed on behalf of Epsilon. Supp.R9.825. That fact was never shared with general counsel. Supp.R9.1398. Hawes did not testify.

iv.  <u>Legal</u>

Bryan Myers was the lead lawyer assigned to the DTC Unit.  Supp.R9.1312.

Lisa Gallerano served as general counsel for Epsilon.  Supp.R9.1318.  Gallerano

was the only lawyer to testify.

b.  *Mailers (Epsilon clients)*

Shawn Sullivan was a mailer with RDD.   Supp.R9.140. Sullivan admitted

that RDD was engaged in a scheme to defraud because not only were RDD mail

pieces intentionally deceptive, RDD did not fulfill the promises made.

Supp.R9.136. Sullivan pled guilty to conspiracy to commit mail fraud and agreed

to testify as part of his plea agreement.  Supp.R9.138.

Phil Lett worked with Infogest and mailer DRC was a client.

Supp.R9.1145. Lett admitted that he and DRC engaged in a scheme to defraud.

Supp.R9.1147. Lett pled guilty to conspiracy to commit mail fraud and agreed to

testify as part of his plea agreement.  Supp.R9.1147.

c.  *List Brokers*

Epsilon worked with list brokers because they had a lot of sway with

clients.  Supp.R9.498.  List brokers often placed the orders and performed the

analytical work.  Supp.R9.498.  List brokers received commission of

approximately 10-20 percent of the order they placed. Supp.R9.498.  Jill

Castellano with Saavoy was the only list broker to testify.  Castellano pled guilty to conspiracy to commit mail fraud.  Supp.R9.1089.

### B.  The Investigation

In September 2016, the Department of Justice issued a press release regarding its investigation.  Supp.R9.212-215; Supp.R10.Exh.13.  A link to that press release, which identified a broker (Macromark) and a mailer (BDK) that Epsilon did business with circulated around the DTC Unit.  Supp.R9.207, Supp.R10.Exh.17.  Lytle classified the investigation as an "Earthquake." Supp.R9.259, Supp.R10.Exh.15.  The Treasury Department issued a press release which described actions being taken against payment processor PacNet and mailer BDK. Supp.R9.652, Supp.R14.Exh.181A.  Within the DTC, others circulated the links.  BDM Andrews said "Not sure what we do with BDK but legally might make sense for us to distance ourselves from them." Supp.R9.656.

Between September and October 2016, the DTC attorney and President were aware of actions against sweepstakes clients.  Myers received a temporary restraining order (TRO) regarding Epsilon clients.  Kessler and Andrews were part of a call discussing how to respond. Supp.R9.769, Supp.R14.Exh.197.  Myers knew that the TRO related to sweepstakes mailings.  Supp.R9.774.  The substance of that call was shared via email with the rest of the DTC, including Lytle.

Supp.R9.774.  Kessler directed members of his team, including Lytle, that there
was no need to be proactive.  Supp.R9.776.

In a meeting days later, Kessler mentioned the DOJ investigation to other
executives, including Hawes.  Supp.R9.785, 790; Supp.R20.Exh.777.  Kessler
expressed concern to Reger about the impact that Macromark could have on his
team.  Supp.R9.779.  Kessler was never told to stop doing business with clients
subject to investigation. Supp.R9.793.

In January 2017, the investigation came to Epsilon related to first three,
then four brokers including RMI, Saavoy, Macromark and Digital Matrix
International. Supp.R9.1315, R20.Exh.829A.  Gallerano was directed to Reger for
information.  Supp.R9.1323. Reger was included in calls with counsel because he
was designated as the person most knowledgeable about the business.
Supp.R9.1346.  Gallerano didn't know Lytle. Supp.R9.1309.  A preservation letter
was sent to employees directing them not to destroy material and not to discuss
the investigation.  Supp.R9.1395.  At the time, Gallerano didn't understand that
Epsilon was not reviewing content. Supp.R9.1363.  In response to the
government, Epsilon produced emails, a database list and SalesForce (a client
relationship management system) data as well as information from laptops.
Supp.R9.96-98.  The instruction given to employees, including Lytle, was
business as usual. Supp.R9.948.

### C. Evidence Regarding Specific Mailers

1. Destiny Research Center[3] (Count 1)

In 2008 or 2009, DRC was one of the clients Kessler worked with while he was still an account executive.  Supp.R9.541,544.  Reger assigned Kessler as the AE.  Supp.R9.545, Supp.R11.Exh.54.  Kessler thought the mail piece was deceptive and brought it to then vice president Reger's attention.  Supp.R9.539.  Though Reger offered to have the client assigned to someone else if Kessler was uncomfortable, Kessler continued working with them.  Supp.R9.539. At the time, Kessler thought it was normal.  Supp.R9.545.  By trial, he did not think it was okay.  *Id.*  Kessler's day-to-day contact with DRC was with Lett. *Id.*  Kessler worked with DRC until 2014. Supp.R9.541.  DRC stopped mailing because DOJ "shut them down."  Supp.R9.550

Kessler opined that he didn't believe that representations in the DRC creative that recipients were going to win money was true.  Supp.R9.543, Supp.R.19.Exh.312.  Nor did he think it possible to prepare a personal astral-clairvoyant. Supp.R9.544.  He also thought that Maria Duval, the character in the creative was some sort of fictional character. Supp.R9.540.  Lett said that Maria Duval was a real astrologer.  Supp.R9.1151.

DRC operated under the name Zodiac Zone. Supp.R9.1149.

---

[3] DRC is the only mailer that does not have an associated mail or wire fraud count.

2.  <u>Registered Disbursement Division (ESC, CDS) (Counts 2, 3, 14-19)</u>

RDD was a sweepstakes mailing operation owned in part by Sullivan. Supp.R9.139.  By Sullivan's own admission, the company sent out deceptive sweepstakes mail pieces and the people didn't win prizes. Supp.R9.136-137. Accountants would set up the business, and they used multiple company names. Supp.R9.140.  Exclusive Selection Committee, or ESC was another name they used.  Supp.R9.154.  Company names changed multiple times per year. Supp.R9.159.  Checks and money orders received were sent to PacNet, which functioned as a bank or clearinghouse.  Supp.R9.144.  When PacNet shutdown, the industry came to a screeching halt.  With no one to clear their funds, they were effectively put out of business. Supp.R9.163.

Consumer names came from a list broker. Supp.R9.150.  Castellano was their list broker and recommended Epsilon.  Supp.R9.151-152.  Sullivan never interacted with anyone at Epsilon.  Supp.R9.153.

Sullivan testified about some of the creatives they used.  Supp.R9.147, 155; Supp.R10.Exh.1; Supp.R.15.Exh.280, Exh.281.  RDD had two separate promotions.  One was a sweeps report – a booklet listing legitimate sweepstakes being run.  Supp.R9.160.  The other promotion was a combination of a sweeps report and everyone wins.  Supp.R9.160.  As to the guaranteed cash prize, they sent a dollar plus the report.  Supp.R9.161.  They stopped sending the

guaranteed one-dollar prize because recipients were forging higher amounts on the checks and cashing them. Supp.R9.161. The offers were designed so that people would think they were getting a large cash prize, not a sweeps report. Supp.R9.165.

Lytle was the BDM who signed RDD. Jeff Krech was the primary account executive who sold data to RDD. Supp.R9.914. Castellano knew several things about RDD that she didn't share with Lytle or Krech, including her suspicion that the reason RDD changed names was to avoid detection. Supp.R9.1080-1081. RDD continued to order, and Epsilon continued to ship names, until 2016. Supp.R9.915-916, 283. Two shipment emails, which did not include Lytle, were sent on June 13, 2016 and August 30, 2016. Supp.R9.916, Supp.R11.Exh.32; Supp.R9.917, Supp.R11.Exh.33. These shipments compromise Count 2 and 3 wire fraud counts. The checks written by four individuals to RDD or one of its entities compromise mail fraud counts 14-20 and is summarized in Exhibit 406. Supp.R20.Exh.406.

### 3. Gold Rush (Count 4)

Castellano brought mailer Gold Rush to Epsilon. Lytle was the BDM who signed Gold Rush following the same standardized signing process. Supp.R9.923. The Master Services Agreement was signed November 19, 2013. Supp.R9.919, 922; Supp.R.21.Exh.Y12. The data was shipped in September 2016.

Supp.R.11.Exh.34 (Count 4 wire fraud).  Epsilon had a process in place, known as "seeding" that would cause an actual mail piece sent by the mailer to come back to a "seed" or former employee.  There were no complaints as to any offer from Gold Rush. Supp.R9.925.  A sample of the Gold Rush creative was located in Lytle's One Drive. Supp.R9.1010, Supp.R11.Exh.4H, Supp.R.20.Exh.404.  When asked if he thought Gold Rush was one of DTC's deceptive mailers, Kessler answered affirmatively. Supp.R9.1011

### 4.  Email (Count 5)

After the DOJ press release, Lytle emailed Kessler about a couple of mailers potentially wanting to bring accounts to Epsilon because of a Canadian payment processor shut down.  Supp.R9.708, Supp.R.14.206.  It referenced brokers David Malamed and Castellano, both of whom represented opportunity seeker clients.  Supp.R9.709.  Two weeks later Lytle requested a preassignment for Malamed's client JKS Ventures. Supp.R9.711.

### 5.  Diamond Dollars (Count 7)

Diamond Dollars was a Castellano client.  Supp.R9.939, 1093.  Lytle signed Diamond Dollars following the exact same signing process. Supp.R9.1741.  He requested an MRC code with the sample creative attached.  Supp.R9.1523, Supp.R14.Exh.208, 208A.  Standard welcome email announcing the signing sent to the new client mailing list.  The email described Diamond Dollars as

marketing puzzles and contests of skill to US consumers. Supp.R9.1014, Supp.21.Exh.Y72. Hawes signed the standardized agreement on behalf of Epsilon on October 10, 2016. Supp.R9.937. At that point, the client "belonged" to the account executive who became responsible for the client relationship. Names were shipped on November 14, 2016. (Count 7). Supp.R9.938, Supp.R11.Exh.37. Lytle was not part of that shipping email. Supp.R9.939.

A Diamond Dollars creative was in Lytle's One Drive. Supp.R9.391, 1015, Supp.R10.Exh.4L, Supp.R20.Exh.404.

6. JKS Ventures (Counts 1,6,10)

JKS Ventures was a mailer signed by Lytle after the press release in September 2016. Supp.R9.358. JKS was mailing a sweeps, sweepstakes report according to an email from Lytle asking for a pre-assignment. Supp.R9.710-711, Supp.R14.Exh.217. A sample creative was attached. Supp.R9.942-943, Supp.R14.Exh.217A, Supp.R10.Exh.4C. Krech was assigned as account executive. Supp.R9.944. Lytle sent out a welcome email identifying client contacts as John Muller and David Malamed. Supp.R9.704. Years earlier, Lytle made a note in SalesForce where Muller was described as a mailer who used someone as a "designated convict" if there was trouble. Supp.R9.1527-28, Supp.R.10.Exh.5.

Data was not shipped until May 2017, when there was a signed contract. Supp.R9.944, Supp.R11.Exh.40. The sample creative was saved in Lytle's One Drive. Supp.R9.358-359, Supp.R10.Exh.4C, Supp.R.20.Exh.404.

### 7. Palm Beach (Count 9)

 Palm Beach was another Castellano client signed by Lytle.  Supp.R9.949. Castellano sent Lytle the creative. Supp.R9.1061; Supp.R.20.Exh.319,319A.  Palm Beach was the back-end offer to Design Database.  Supp.R9.1062.  Design Database sent out a sweepstakes report.  If a customer responded, they were mailed a Palm Beach promotion. Supp.R9.1063. The standard process was followed: Lytle pulled the documents together to get them signed, received the creative, received preassignments, the documents were signed by the client and taken to Hawes to be signed. Supp.R9.941.  The welcome email went out, acquisition call happened and the account was transferred to the account executive.  Supp.R9.951.  The signed contract had to come back before data went out. Supp.R9.941.  In May 2017, Epsilon shipped names to Palm Beach. Supp.R9.951, Supp.R11.Exh.39) (Count 9 wire fraud).

### 8. National Consumer Division (Counts 1, 8, 12, 13)

Lytle signed NCD in April 2017.  He requested a preassignment. Supp.R9.510, Supp.R15.Exh.250.   Lytle sent the "Welcome email" letting the sales team and department managers know that NCD had been signed.  Kessler

congratulated Lytle.  Lytle responded with things that caused some concern but thought that NCD would mail aggressively.  Supp.R9.514-515.  In July 2017, Lytle emailed NCD to see how things were going.  Lytle passed on the response to the account executive who in turn relayed it to Kessler. Supp.R9.517.  Kessler responded it was crazy they wanted to join so soon.  Lytle responded "That first mailing must have really not met their ROI expectations.  Or they went to jail. It's all the same."  Supp.R9.263, Supp.R11.Exh.42. (Count 12, wire fraud). Kessler testified he wasn't surprised because they had other clients in the past who had gone to jail. Supp.R9.518.  After this exchange, NCD placed another email with Epsilon and shipped names. Supp.R9.519, Supp.R11.Exh.43. (Count 13, wire fraud).

The NCD creative contained a notification of unclaimed cash and prizes. Supp.R9.507, Supp.R10.Exh.3.  In Kessler's opinion, the statement is trying to convey that someone won 2.45 million dollars and he didn't believe it to be true. Supp.R9.509.

### 9. Live Tree (Count 11)

In July 2017, an email was routed to Lytle from an Epsilon-UK associate via Kessler.  Supp.R9.609.  Live Tree was presumed to be an opportunity seeker - Lytle's category.  Supp.R9.611.  Lytle agreed to reach out but cautioned that owner Matt Pisoni may be barred from mailing.  Supp.R9.611, Supp.R15.Exh.261,

Supp.R19.Exh.314. (Count 11 wire fraud). Live Tree was not signed as a client
and no creative was provided.

## SUMMARY OF ARGUMENT

Lytle challenges all of his 20 convictions – mail and wire fraud and
conspiracy to commit mail and wire fraud - based on insufficiency of the
evidence.  No small task, given the number of convictions and the light in which
this Court must review the evidence.  Yet illuminated, the gaps in the
government's proof were filled by piling inferences lacking in logic, leading to
verdicts based on speculation and conjecture.  The 20 convictions can be broken
down into four discreet challenges.

**Issue 1:**  The evidence was sufficient to establish that Epsilon client RDD
engaged in a scheme to defraud and that Epsilon sold names and address to
RDD or one of its businesses for a period of three years, resulting shipments
data in 2016 (Counts 2 and 3) to 4 individuals (Counts 14-20) who mailed in a
check hoping to win a large amount of money.  The evidence is insufficient to
establish that Lytle knew, at the time of signing RDD and collecting the sample
creative, that the mailing was designed to make customers believe they had won
something when in fact, RDD was not paying the guaranteed prize.  Lytle did
not know anyone at RDD, the broker bringing the client to Epsilon did not share

that knowledge, and his personal experience in the direct mail industry was that the promotion was fulfilled by a guaranteed payment and the product offered.

**Issue 2:**  The evidence was insufficient to establish that Epsilon clients Gold Rush (Count 4), JKS Ventures (Counts 6 and 10), Diamond Dollars (Count 7), Palm Beach (Count 9) or NCD (Counts 8, 12 and 13) engaged in a scheme to defraud where the only evidence of a scheme to defraud was opinion testimony that the promotional mail pieces were shady or deceptive without identification of what made the statements false or fraudulent and without consideration of the entire mail piece.  This left the jury to speculate about the intent behind the statements, representations and promises.  There was no evidence that Lytle believed at the time he signed each client or engaged with communications with brokers representing one or more of these clients (Count 5), that the client was engaged in a scheme to defraud its consumers and that by signing the client, Lytle was facilitating that scheme.

**Issue 3:**  The evidence was insufficient to prove that when Lytle was asked to follow up with a mailer who he knew had legal issues, may have gone to jail and was possibly barred from the direct mail industry, that Lytle knew the individual was seeking to engage in fraud.  No sample mail piece was collected and no contracts were signed and following the advice of the legal department, Lytle ceased communications with the mailer.  Even in the light most favorable

23

to the government, this amounted to suspicion and lacked the necessary affirmative action to constitute aiding and abetting.

**Issue 4:**  The evidence was insufficient to establish that there was an agreement to commit mail fraud and that Lytle knowingly and voluntarily agreed to enter into that agreement.  There was an independent contractual relationship between the client and Epsilon, the client warranted that it would comply with all laws, regulations and guidelines, and Lytle was not tasked with assessing the legitimacy of the client's business nor advertising copy compliance.  Mere knowledge that some direct mailers, brokers and a payment processor were subject to government civil or criminal action did not mean that all promotions involving sweepstakes or other the like were unlawful but allowed the gap in evidence to be filled with guilt by association.

## ARGUMENT

### A. Sufficiency of the Evidence

After the government rested, Lytle moved for a Rule 29 judgment of acquittal on all counts.  Supp.R9.1577-78.  The motion was denied.  Supp.R9.1584-86.  The renewed motion at the close of evidence was also denied.  Supp.R9.1958.  This Court "review[s] the denial of a judgment of acquittal for insufficient evidence to novo."  *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013).

When the sufficiency of the evidence to uphold a conviction is challenged, the reviewing court must "examine, in the light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993).   When the piling of inferences raises no more than a suspicion of guilt, a conviction won't stand.  *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000). "[R]easonable inferences supported by other reasonable inferences…may warrant a conviction," but "[a] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility."  *United States v. Michel*, 446 F.3d 1122, 1127-28 (10th Cir. 2006)(quotations omitted).

These components set a "high bar" for Lytle challenging his appeal but it is no less high than the government's burden to prove its case beyond a reasonable doubt.  *Rufai*, 732 F.3d at 1188.  Deferential as the standard is to the jury's verdict, it does not equate to abdication of the judicial role.  *United States v. Goldesberry*, 128 F.4th 1183, 1192 (2025).  Rather, it requires vigilance "in enforcing '[t]he constitutional standard…that protects an accused against a conviction' 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'"  *Id.* (*Jackson*, 443 U.S. at 315 (quoting *In re*

*Winship*, 397 U.S. 358, 864 (1970)).  Sufficiency review safeguards a defendant's

right to proof beyond a reasonable doubt. *Id.*

## B. Legal Background

### 1. Mail and Wire Fraud

Prosecution for mail fraud requires proof beyond a reasonable doubt of (1)

a scheme to defraud; (2) an intent to defraud; and (3) use of the mails to execute

the scheme. *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003). The wire

and mail fraud statutes differ only in the means by which the scheme is executed.

*Id.* Lytle's challenges to his convictions rest not on whether there was an email

(wire fraud) or a check (mail fraud) but whether sufficient evidence supports the

existence of a scheme to defraud and if so, Lytle's intent.

"A 'scheme or artifice to defraud' 'connotes a plan or pattern of conduct

which is intended to or is reasonably calculated to deceive persons of ordinary

prudence and comprehension.'" *United States v. Hanson*, 41 F.3d 580, 583 (1990).

In the context of a mail promotion, the distinction between a legal and illegal

scheme is that the illegal scheme must involve a material misrepresentation

which manifests an intent to deceive. *United States v. Goodman*, 984 F.2d 235

(1993).  In *Goodman*, the owner of a direct marketing company was charged in

connection with a mailgram which suggested to recipients that they were eligible

to receive one or more gifts.  On the back of the promotional material were

"details" in block print, explaining the odds of receiving each gift, the prompt

expirations of the offer and an opportunity to call, at the recipient's cost, a

number which would inform them of whether they were a winner. Some

recipients thought they had won two prizes – a discount coupon and a cash

prize. The Eighth Circuit rejected the argument that the statements were false or

fraudulent based on what was not disclosed.

*Goodman* teaches that in the case of a promotional piece, context is

important and that deception alone is not enough. Even "sleazy" or "shrewd"

promotional schemes need some objective evidence demonstrating a scheme to

defraud. *Id*. at 240.

2. <u>Conspiracy</u>

To convict Lytle of conspiracy, the government had to prove that he

agreed with at least one other person to commit mail or wire fraud; that he knew

the essential objective of the conspiracy; that he knowingly and voluntarily

participated in the conspiracy; and that there was interdependence among the

members. R1.913. As to intent, "a defendant must possess 'at least the degree of

criminal intent necessary for the substantive offense itself.'" *United States v.*

*Austin*, 786 F.2d 986, 988 (10th Cir. 1986). Knowledge of the conspiracy's objective

is necessary to show the requisite criminal intent. And that knowledge must be

shown by "clear, unequivocal evidence." *Rahseparian*, at 1262 (quoting *United*

27

*States v. Austin*, 786 F.2d 986, 988 (10th Cir. 1986)). Without clear, unequivocal evidence that Lytle knew of the conspiracy's objective, the Government has not met its burden.

    3.  <u>Liability as a principal, aider and abettor</u>

Lytle was also charged under Section Two, Title 18 with aiding and abetting. Aiding and abetting has two requirements – an affirmative act and intent. *Rosemond v. United States*, 134 S.Ct. 65, 71 (2014). When intent is derived from knowledge, it requires advance knowledge before the act. *Id*. at 83. "What matters for purposes of gauging intent, and so what jury instructions should convey, is that the defendant has chosen, with full knowledge, to participate in the illegal scheme." *Id*. at 79.

To the extent that any scheme to defraud existed, it was created by the mailer clients that did business with Epsilon. Not by Lytle. Only if Lytle actively participated with advance knowledge of the scheme to defraud can he be held responsible.

**C.  Gaps in the evidence as to wrongdoing on the part of certain Epsilon clients caused the jury to engage in speculation and conjecture based on unsubstantiated accusation, affiliation and association.**

Proof of a scheme to defraud as to RDD and DRC was established by the mailers associated with those entities who explicitly testified that what they were doing was fraudulent. But as to the other mailers and their alleged wrongdoing – and derivatively, Lytle's knowledge of wrongdoing – the government relied on

inferences generated from what other mailers were doing, legal actions brought by the Department of Justice and other government agencies, and association with others accused of wrongdoing. The limitations on inferences to be drawn from the evidence are discussed before addressing the evidentiary shortfalls of each count.

Because the press release broadly finger-pointed at specific mailers, brokers and others in the direct mail industry, the government asked the jury to infer that Lytle knew that the mailers and brokers he dealt with after September 2016 were engaged in fraud. But the press release was not offered as proof of wrong-doing, just notice, i.e., Lytle's awareness that the government suspected certain individuals and entities of wrong-doing. Yet notwithstanding that Lytle had nothing to do with payment processor PacNet, no on-going relationship with mailer BDK, list broker Macromark, and mailers Glenn Burke and David Raff, the government played up the accusations and Lytle's familiarity with the businesses or individuals.

In his initial reaction to the news, Lytle repeated the government's ominous description of PacNet as a "transnational criminal organization". Supp.R10.Exh.16. But no evidence that PacNet was actually a transnational criminal organization was admitted. The inferences to be drawn? Lytle read the press release. And he recognized that international clients that used PacNet to

process payments could be impacted and unable to pay outstanding Epsilon invoices. Inferring that all entities that used PacNet were engaged in wrongdoing would be unreasonable. But familiarity with PacNet set the stage for guilt by association.

The press release described the wrongful conduct by named entities, *none of which are named in the substantive counts*: "they instructed consumers to pay a fee of approximately $25 to collect their prizes, but those who paid received nothing in return" and described one individual named David Raff as being responsible. Supp.R9.214-215. Reger knew Raff but Raff was no one that anyone liked. He was rude and disrespectful and Reger severed Epsilon's broker relationship with him years earlier. Supp.R9.672. When pressed about an entry in Salesforce suggesting Raff was a client in 2010 or 2011, the postal agent admitted he didn't know if Raff was an Epsilon client after 2011. Supp.R9.376-377; Supp.R20.Exh.341. Kessler wasn't even sure that Raff was still working with them in 2009 or 2010. Supp.R9.837. Lytle didn't begin working for Epsilon until 2012. Reger's reaction to the notification, "Interesting, Fritz. Read the Florida one –it's David Raff. We all knew he was crooked." Supp.R9.216; Supp.R10.Exh.17. And Lytle's reaction, "Damn, they popped Raff." Supp.R10.Exh.16. Any inference to be drawn is extraordinarily limited. Despite having access to all of Lytle's, Reger's and Kessler's emails, there was no other

evidence to imply that Lytle had anything more than passing familiarity with the accused individual named Raff.  Reger's comment that he was crooked was not directed at Lytle nor was there any response that suggested Lytle agreed with that characterization.

Familiarity was used to start piling on inferences and create a climate of guilt by association.  Consider how the government did this, first through an overview witness who read Reger's and Lytle's reactions to Raff being named in the press release. And finishing with a summary witness who testified about Reger's reaction to Raff and an email sent four days after the press release about the possibility of doing business with another broker.  Supp.R9.1518.  Yet no evidence was introduced to show that the brokers referenced in the press release were actually engaged in fraud.   As to Reger, "Not a word of distress about the reports of fraud, because he didn't care. David's response to the earthquake was no better, and it showed how deep he was in this fraud industry," argued the prosecutor.  Supp.R9.2067.  Similar associations were made of mailer Glenn Burke. Supp.R9.260.

Mere familiarity with a person accused of a crime is not enough to establish that Lytle was engaged in any scheme to defraud.  The Court "must be careful to guard against guilt by association, to scrupulously safeguard each

31

defendant individually, as far as possible, from loss of identity in the mass."
*United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992) (quotations omitted).

Following the discussion that DTC members had about the DOJ and the Department of Treasury releases, Lytle emailed Kessler asking him to call about Malamed and Saavoy pushing business to Epsilon. Supp.R9.708; Supp.R14.Exh.206. (Count 5). Kessler didn't remember the email nor the substance of the discussion. Supp.R9.940.   Subsequently, Malamed brought JKS Ventures to Epsilon and Saavoy brought multiple clients beginning with Design Line/Diamond Dollars. Supp.R9.940, 1093. Neither of those clients reflects a scheme to defraud, for the reasons explained below.  And simply because some in that industry were accused does not mean that *every* client selling a sweeps report or operating a sweepstakes was running a scam.  Absent proof that Lytle intended to work with fraudsters, his reach out to the Epsilon VP about potential business is not evidence of him acting in furtherance of a scheme to defraud.

   1. Creatives from "opportunity seeker" mailers, even if shady, lacked objective evidence demonstrating a scheme to defraud where there was no evidence as to the truth or falsity of the statement or the intent behind the making of it.

Notwithstanding that the press release was supposed to be for "notice" purposes only, the distinction between "notice" and substantive evidence of wrongdoing was lost in the government's repeat characterization of a "fraud industry." Supp.R9.2067, 2078-80. But operating a sweepstakes is not illegal.

Selling a sweeps report is not illegal.  Nor is selling cheap jewelry, expensive artwork, or an astrology reading. Whether any of these *could* be part of a scheme to defraud depends on the specific operation of the business, and its intent. Rather than offer evidence of each business' specific operation or the intent behind it, the government relied on the sample mail pieces as evidence.

Numerous creatives were introduced at trial.  Some related to one of the seven entities identified in the substantive mail and wire fraud counts.  But most came in as samples located in Lytle's One Drive, where one would expect them to be as Lytle collected them as part of Epsilon's client onboarding process. Supp.R9.1493.  A postal inspector overview witness identified about a couple of dozen creatives that had been collected. Award Opportunity was a mailer that used the language "guaranteed winner" in its creative. Supp.R9.1494-95; Supp.R10.Exh.4E.  And to be fair, the language is hyped up.  But next to it in clear, block letter styling are the details of the two-part promo: a sweepstakes for which there is no cost to enter and a sweeps report that has a fee. "Everyone wins" lists the odds of the various monetary prizes.  It offers to provide a list of the winners and gives an address for how someone can obtain those winners. Part Two specifies that it is a report of various current sweepstakes and prize offerings which are free to enter.  The report, or listing, has a fee associated with it.

Award Opportunity's creative is similar to the promotional piece rejected as evidence of fraud in *Goodman*.  "Many shrewd advertising schemes are concocted to persuade the consumer into purchasing products of questionable worth." *Goodman*, 984 F.2d at 239.  A sweeps reports sold for $20 on 50 cents of paper may fall into the category of questionable worth. Supp.R9.1751-52. But neither Lytle nor Epsilon were in the business of passing judgment on the worthiness of a product.  If a consumer wanted to buy a report that would identify all the sweepstakes that he could enter for free and possibly win, more power to him. "Without some objective evidence demonstrating a scheme to defraud, all promotional schemes to make money, even if "sleazy" or "shrewd," would be subject to prosecution on the mere whim of the prosecutor.  More is required under our criminal law." *Goodman*, 984 F.2d at 240.

Here, the "more" that *Goodman* demands is absent. No one from Award Opportunity testified that there was no sweepstakes or guaranteed payments in the odds described, nor that a sweeps report was not sent out as promised.  If Award Opportunity or any of the other mail pieces were indeed part of a scheme to defraud manifested by false and fraudulent statements, representations and promises, the government was required to prove beyond a reasonable doubt not just the false and fraudulent nature of what was contained in the mail pieces but also that it was part of a scheme to defraud. Supp.R1.918-19, Instruction 26.  This

was true about the other mail pieces introduced.  And while the summary postal inspector read snippets from the mail pieces, there was no context as to what made those representations false or fraudulent.

Samples in Lytle's One Drive one supports an inference that Lytle knew what was being offered; he said as much in his welcome emails announcing the clients. Beyond that, no reasonable inference can be drawn that Lytle had any knowledge beyond the samples' faces when he received them from prospective clients.  Epsilon imposed no responsibility for Lytle to verify that the copy content of samples he received was accurate – meaning the total prize winnings were a particular dollar amount – nor that the promotion copy complied with any advertising law or guideline.  Nor was he tasked with any investigation or approval of a prospective client.  The representation that the client made in its Master Services Agreement or SOW with Epsilon was sufficient, for Epsilon's purposes, to ensure that the client would comply with all laws, regulations, and guidelines.   Unlike Reger, who had copywriting experience and was chair of the DMA Ethics Committee which evaluated direct mailings, Lytle lacked that knowledge or expertise.

While Kessler used the word "shady" to describe some of the offerings that fell into this category, "shady" is not the functional equivalent of a scheme to defraud. *See Goodman*, 984 F.2d at 240.  Beyond this description or the

government labeling them as "deceptive," there was no evidence behind the

mailer's words was an intent to deceive, that they weren't producing the product

or payment promised, or that anyone was, in fact, deceived into thinking they

had actually won thousands or millions of dollars rather than *the possibility* of

winning a cash prize.  Absent *any* mailer specific evidence regarding the business

operation, the product, or fulfillment, the mail pieces amount to nothing more

than speculation that the client mailer had intentionally engaged in fraud.

2. <u>Lytle's prior employment with a direct mailer was used to insinuate that Lytle had knowledge of fraudulent activity even though there was no evidence that Next-Gen was engaged in wrongdoing.</u>

Lytle had knowledge about the direct mail industry.  But despite the

government's best efforts to cast Next-Gen, Lytle's previous employer, as a

fraudulent mailer, the evidence fails to support that characterization.  No one

employed at Next-Gen testified.  Kessler testified that Next-Gen, once his

account, had a product that it used to fulfill what it was marketing.  Supp.R9.862.

And while Kessler didn't think that every recipient won the lump sum, he did

think there was a winner. Supp.R9.1001.   Castellano thought Next-Gen sold

"jewelry products wrapped around a sweepstakes." Supp.R9.1074-75.

Nonetheless, despite uncontroverted evidence that Next-Gen operated a

legitimate sweepstakes and sold a real product, the government pointed to

certain statements as false or fraudulent. *See* Supp.R9.632, Supp.R19.Exh.313.

- "Individual Name Printout: Tom Beringer"

- "Confirmed Funds for Payments to Winner, $1 million under '$1 million' it says "Verified"

- "Payment Terms to Individual Named Winner. Final Confirmation by Selective Option Below: $33,334 annually for 30 yrs. Total of $1 million or $528,000 Single Lump-Sum Payment Check"

- "Individual named winner" on the right side, left side: "Individual name: Tom Beringer" – that's who the letter's addressed to.

- "Payment to Winner Amount: $1 million"

- "It is our pleasure to formally inform you of this by private letter, and according to the terms and conditions herein, if you have and return the preselected winning number before the deadline as REQUIRED for formal review and authenticity, the payment terms will be yours to select from options #1 and #2 below with no taxes withheld."

- "The only way you can forfeit your opportunity to WIN and receive the award of $1 million is by not submitting your entry in time, by mail. As such, PLEASE DO NOT DELAY. If determined WINNER, the optional payment choice is definitely -- if determined WINNER, the optional payment choice is definitely the yours for $33,334

CASH every year for 30 consecutive years, (1 million TOTAL) or a generous lump-sum single payment of $528,000."

- "Winners funds are confirmed for potential payment and await Winner's Selection. Choices are $33,334 annually for 30 years, (Total $1 million) or a single lump-sum payment of 528,000, (Section B/No. 3 above)."

The government cherry-picked phrases in isolation, rather than considering the promotion as a whole. Yet Kessler confirmed that the offer described was an *opportunity* to win, not notice that the recipient had won. Supp.R9.863-864. The only way the *opportunity* was forfeited was by not submitting an entry. "Confirmed funds for payment to the winner" meant that there would be a winner and that funds were available for the winner. Supp.R9.865. And that mailing indicated to the recipient that they had an opportunity to win. Supp.R9.865. Accompanying the sweepstakes was an *opportunity* to accept a jewelry offer for $11.89. Supp.R9.864. The mail piece describes the jewelry and makes clear that a fee is required (Merchandise Acquisition Offer). Supp.R9.867. It also makes clear that a purchase is not necessary and will not improve the odds of winning. Supp.R9.867. Nothing about this mail piece suggests that the sweepstakes was not legitimately operated or that jewelry was not provided as promised. But the government

planted the seed that it was in fact fraudulent by comparing it to another mail piece, allowing the jury to grow their own unreasonable inference.

Next-Gen's creative, Kessler said, was similar to other sweepstakes in the DTC Unit.  Supp.R9.491; Supp.R19.Exh.313. Two promotions can be facially similar but substantively very different.  "Criminal fraud cannot turn on semantical phrases, especially those which contain equivalent meanings." *Goodman*, 984 F.2d at 239.  Whether either promotion was part of a scheme to defraud is dependent on whether a product was offered and whether the promotion intended to deceive via false or fraudulent statements, promises, or representations. But that determination cannot be made based on speculation and inference stacking.

Lytle's own words, sponsored by the government, further negate a belief on Lytle's part that Next-Gen was engaged in a scheme to defraud.  In discussing another non-sweepstakes mailer that had been flagged based on its copy content, Lytle noted that, like Next-Gen, it pushed up to the thin grey line. Supp.R9.575-78; Supp.R10.Exh.6. This affirms that Lytle understood that there were limits on copy but that he believed that the copy was compliant.  Lytle further expressed frustration that there were no guidelines to help them know what was or was not appropriate. Supp.R10.Exh.6. Lytle never reviewed copy, nor had he ever been tasked with copy review - at Next-Gen or in any prior employment.

Supp.R9.862.  Opined Kessler, Lytle's strength was in the technical and

marketing aspect, not in advertising. Supp.R9.854.  Advertising copy alone is

insufficient evidence of a scheme to defraud.

3. <u>Awareness of some opportunity seeker mailers facing legal issues is not
sufficient to infer that all opportunity seeker mailers were engaged in fraud.</u>

Lytle's awareness of government legal action against certain mailers was

evidenced by court pleadings located in his One Drive, and emails he sent to

others in the DTC to alert them. Supp.R9.1803, 247-60. In October of 2015, Lytle

forwarded information that Mail Tree and Matt Pisoni were facing legal issues.

Supp.R9.1778-79, 343-44. Not his account. Supp.R9.609-10. But he circulated the

information to the person with decision-making authority who oversaw sales

and to the account executive. Supp.R9.1778-79.  When asked if he wanted to keep

an employee of Pisoni's in his pipeline, he responded with an emphatic "No."

Supp.R13.Exh.153. Knowledge that Pisoni faced criminal charges at one point,

without more, does not allow for a reasonable inference that those same legal

issues plagued him 20 months later. Nor can evidence of one mailer's legal

difficulties be extrapolated to all other opportunity seeker mailers.

When the government issued its press releases a year later, this notice had

limited impact on Lytle for two reasons.  One, his relationship with any client

was fleeting – sign them up and hand them off.  Second, there was no evidence

he was working with anyone named in the press release.  Mere accusation of the

government as to others is not proof beyond a reasonable doubt as to the

wrongdoing of those companies.  The press release made that clear: "The charges

and allegations in the indictments and criminal complaint are merely

accusations, and the defendants are presumed innocent unless and until proven

guilty. The claims made in the civil complaints are allegations only, and there has

been no determination of liability." Supp.R10.Exh.13. And if it not proof beyond

a reasonable doubt as to those companies, surely they can't support an inference

of guilt beyond a reasonable doubt of different entities.

In January 2017, Lytle knew that the Department of Justice had reached

out to Epsilon about brokers that did business with Epsilon.  While no specifics

were provided to him, he was aware that it related at least, in part, to the

information acquired via the press release.  The information that came to him

was that it was "business as usual", the legal department was involved, and not

to discuss the investigation with anyone. Supp.R9.1874-75; Supp.R20.Exh.357.

From that guidance Lytle could not have gleaned that something different

needed to be done.

4. <u>Relationships with others at Epsilon and in the direct mail industry is
   insufficient to permit an inference of knowledge.</u>

Knowledge attributable to Kessler or Reger does not support an inference

that Lytle had the same knowledge.  Kessler pled guilty to conspiracy to commit

mail fraud based on his role. Supp.R9.503.  His guilt is not evidence of Lytle's.

*United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983) ("A codefendant's guilty plea may not be used as substantive evidence of a defendant's guilt."). Moreover, Kessler's role was decidedly different than Lytle's.  Lytle's responsibility, by all accounts, was to sign up the clients. Supp.R9.493, 694, 1827. Once the client had agreed to the terms, Lytle's responsibility ended. Supp.R9.830-31. Kessler's continued: he provided direct oversight of the account executives responsible for the day-to-day relationship with the companies and the actual sale of data. Supp.R9.478-81.  He was Reger's replacement as a person with knowledge supporting the legal team.  He did creative review, at least with respect to potency.  As VP, he was in a position to authorize whether Epsilon would continue working with certain clients.  He had knowledge by virtue of his position.

Reger, opined Kessler, knew the type of clients that Epsilon signed. Supp.R9.523. In 2008, Kessler complained to Reger about newly signed DRC; more than 7 years later, discussed by email with Lytle and Reger that client had been shut down by law enforcement.  Supp.R9.2062, 2072-73.

Reger, as portrayed by the government, had specific expertise in copywriting and was seemingly indifferent to what Epsilon clients were peddling.  Reger chaired the Ethics Committee of the Direct Marketing Association and on a regular basis, reviewed the content of direct mail pieces to

determine whether the mailer violated DMA guidelines. Supp.R9.488-89, Supp.R.20.Exh.361B.  After one such review, Reger opined to a co-worker that he thought Epsilon might do business with some of these actors under review but failed to take any steps to stop the business, notwithstanding his position as the Senior Vice President. Supp.R9.539. Nor was there evidence that he shared that knowledge with Lytle.

When the investigation shifted to Epsilon's affiliation with certain brokers in January 2017, Reger was the point person who provided information to Epsilon's in-house counsel. Supp.R9.1343-44. Notably, the attorney with whom Reger had the most contact and shared information didn't testify.  Gallerano either didn't know much or suggested that Reger had been less than forthcoming about Epsilon's business.

The government attempted to impart Reger's knowledge to Lytle. It implied that they were in cahoots, merely because Lytle had been hired by Reger, was supervised by Kessler who was supervised by Reger, and after leaving Epsilon, turned to Reger for assistance in employment. Supp.R9.2060.  No email traffic supported this relationship, Lytle didn't report to Reger and didn't work in the same physical office as Reger.  Relationships with those accused or convicted of wrongdoing impose a risk that guilt will be assumed by association. Courts must safeguard against this, whether in the conspiracy context or in the

aiding and abetting context. *Rufai,* 732 at 1192. "'Evidence that only places the defendant in a climate of activity that reeks of something foul' is insufficient to demonstrate criminal knowledge." *Id.,* (quoting *United States v. Austin*, 786 F.2d 986, 988 (10th Cir. 1986)).

With this in mind, we turn to the evidence regarding the specific mailers.

**D. Issue One:  Was the evidence sufficient to show that Lytle knew that RDD was engaged in a scheme to defraud at the time he signed them in August 2013?**

1.  <u>Registered Disbursement Division (Counts 2, 3, 14-20)</u>

RDD operated a scheme to defraud.  Sullivan admitted as much. The two-fold promo promised a guaranteed payment and a sweeps report.  Supp.R9.160-161. Though every buyer received a sweeps report, the guaranteed one-dollar payment was only sent out for about six months. Supp.R9.161. So the promise of a guaranteed payment was false.

But that wasn't evident from the promo itself.  And as to the three witnesses who discussed RDD, only Sullivan testified that RDD was a scam.  He did not interact with anyone at Epsilon so that information could not have flowed from him to Lytle. Supp.R9.153. Neither Castellano nor Kessler indicated that they knew that RDD was a scam at the time Castellano brought RDD to Epsilon, nor that they talked to Lytle about it.

Nor were there any emails that would permit an inference that Lytle knew it was a scam.  Signed in 2013, information regarding government actions wouldn't filter through email for at least two more years.  Lytle wasn't privy to Castellano's email telling the account executive about the name changes. Supp.R9.1570; Supp.R13.Exh.159.  Nor did Castellano share with Lytle (or anyone else), her suspicion that the reason for the name changes was to avoid detection. Supp.R9.1080-82. All of Lytle's One Drive and emails collected as part of the government investigation and nothing suggests that Lytle ever acquired information that RDD was engaged in a scam.

Absent advance knowledge, it is impossible to infer that Lytle had the requisite intent to aid and abet the fraud by collecting the sample mail piece and signed contract and sending it to the President for approval and execution. Without knowledge and intent, signing the client is insufficient to establish that he aided and abetted the consumer names and addresses that were shipped three years later (Counts Two and Three wire fraud) or the checks sent in response to the promotions (Counts 14-20 mail fraud).

**E. Issue Two:  Absent direct evidence that a mailer engaged in fraud, did inferences drawn from the mail pieces and accusations against other business entities amount to conjecture and speculation that there was a scheme to defraud and that prior to signing any client, Lytle had the requisite advance knowledge to infer his intent?**

1. <u>Gold Rush (Count 4)</u>

45

Gold Rush fares no better. Gold Rush was signed in November 2013 following the same contractual process followed for all clients.  Supp.R9.921-2; Supp.R21.Exh.Y-12a.   The shipment was sent three years later.  Supp.R9.924; Supp.R11.Exh.34 (Count 4 wire fraud). When questioned about the Gold Rush creative, Kessler confirmed that that mail piece said "Payment Verification $1,219,465" and "Vault Release Certificate." Supp.R9.1011.  Based on those two statements, Kessler agreed when asked if he thought Gold Rush was one of the deceptive mailers that DTC was providing names for. Supp.R9.1011.  Without more, those representations are not evidence of fraud.  The reverse side of the mail piece made it plain: it was offering a sweeps report and the amount specified was the total amount offered by independent sponsors. Supp.R10.Exh.4H.  It specifies that "simply for responding, without or without purchase," the recipient will receive a check. *Id*. The odds and the monetary amount associated with those odds is also listed. *Id*.

Akin to the promotional material in *Goodman* which contained a similar disclosure, the statements were plain, and "not 'reasonably calculated to deceive person of ordinary prudence.'"  *Goodman*, 984 F.2d at 239, *quoting United States v. McNeive*, 536 F.2d 1245, 1249 n. 10 (8th Cir. 1976).  Here, no evidence was presented that cash prizes were not sent. No evidence was presented that sweeps reports were not sent. And no evidence was presented that any recipient was

46

confused by the offering.  Castellano testified that she hadn't considered whether folks selling a sweeps report for a price was more or less legitimate than a pure sweepstakes.  Supp.R9.1079-80.  Castellano also admitted to knowing information about Gold Rush, that could have suggested Gold Rush was concealing information, like using a buffer person between the actual list owner and the named list owner. But she did not share that information with Lytle. Supp.R9.1082.

The evidence is insufficient to support that Gold Rush was engaged in fraud or alternatively, that Lytle knew it.

2. Email Referencing the Canadian Processor and Brokers (Count 5)

Shortly after the press release in 2016, this Lytle-sent email to Kessler suggests a call, and references the issue with PacNet pushing business Epsilon's way, referring to brokers Castellano and Malamed.  Kessler has no recall of any conversation.  Castellano has no specific memory of the conversation.  While an inference can be drawn that JKS Ventures and Diamond Dollars were the mailers to be onboarded, without more, there is no evidence to support that the email furthered any scheme to defraud.  Proof that an email was sent is not, by itself, sufficient to establish wire fraud.  *United States v. Hollis*, 971 F.1d 1441, 1448 (10th Cir. 1992) (discussing sufficiency in the context of mail fraud).

3. JKS Ventures (Count 6, 10)

47

For this post-press release signing, Lytle followed the same procedures he followed with any prospective client including sending the pre-assignment email, creative attached, to Kessler and the request for codes. Supp.R9.261-62; Supp.R11.Exh.36; Supp.R11.Exh. 38; Supp.R14.Exh.217. JKS marketed a puzzle. Supp.R9.1870-71. As part of the onboarding process, Lytle sent an email asking for the MRC and Category Codes assignments – this was the basis of Count 6. *See* Supp.R11.Exh.36. Names and addresses were shipped in May 2017 (Count 10). Kessler labeled the mail piece as deceptive, without saying what about the advertisement made it so. Supp.R9.1021. Not a single witness testified about JKS Ventures' operations. Not a single witness claimed to have even received a JKS Ventures mailing, let alone be deceived by it. Kessler never verified whether these companies were actually conducting their sweepstakes as advertised. Supp.R9.860. Nor did he know whether any of the offers were actually fulfilled. Supp.R9.861. In fact, only after spending time with the government, looking at the mail pieces, could he say that some of the language appeared to him to be deceptive. Supp.R9.861. A statement must be analyzed in "the context" in which it is made. *United States v. Briggs*, 592 U.S. 69, 72 (2020). In advertising, context matters and requires some objective evidence demonstrating fraud. *Goodman*, 984 F.2d at 239-240.

Neither the awareness that some in the industry faced accusation by the government nor the fact that the broker bringing the case to Lytle gives rise to that objective evidence. Even in the light most favorable to the government, Mueller's association with JKS Ventures does not make JKS Ventures an unlawful activity. Speculation and conjecture.

Here, there is no evidence that any of the products were unlawful. Could promotions have been written differently? Sure. But whether the statements were false or fraudulent depended on evidence not in the record. So determining that any statement is false or fraudulent is mere speculation. Attributing fraudulent intent behind the promotional material of a company that Lytle had nothing to do with is further conjecture. The evidence is insufficient to support the mail or wire fraud counts associated with JKS Ventures.

4. Diamond Dollars (Count 7)

The signing of Diamond Dollars was another post-press release Lytle signing following normal protocol. Neither the mailer nor the broker testified that the Diamond Dollars mailings were a scam. As to Kessler, he has no recall of Diamond Dollars being a client, let alone seeing a creative. Supp.R9.935.

When the creative was described, nothing was identified as a false or fraudulent representation. Instead, Kessler merely read from the creative as directed without explaining – most likely because he lacked any knowledge that

the promotion was part of a scheme to defraud – what statements were false or fraudulent. *See* Supp.R9.1015-16; Supp.R10.Exh.4L. "Great News Sample A. "Mr. Samplenamespace… we would like to start processing your $6,000 paperwork right away. Only YOU can activate your prize status. Complete the form below and mail preferably within the next 10 days for fastest processing." Supp.R9.1016. That statement is only part of an overall advertisement. By itself, there was no evidence of the statement or representation being fraudulent. *Goodman*, 984 F.2d at 240. And taken in context with the entire exhibit, there is no evidence that it is part of a scheme to defraud. *See* Supp.R10.Exh.4L. The creative expressly identifies the promotion and contest rules. It identifies the recipient as a contestant, not a winner: "This promotional offer represents an invitation to enter the competition, and does not mean the recipient has already won a cash prize." Supp.R10.Exh.4L. Lytle understood it to be a puzzle contest. Supp.R9.1870-71; Supp.R14.Exh.208A. While the first page didn't appear to reference a puzzle or contest, the second page did. Supp.R9.1863, 1870-71. The jury had no evidence as to whether any statement was actually false or deceptive made with the intent to defraud because it had no evidence about the business operation or the mens rea of the person making the statement. The sample mailpiece itself is of no aid.

50

That the mailpiece on its face didn't cause alarm or concern is evidenced by the legal department's reaction to the same.  The account executive sent a sample to Reger to be forwarded to one of the attorneys who took no action. *See* Supp.R9.1337-38, 386-87; Supp.R20.Exh.337; Supp.R20.Exh.337E. The inference to be drawn is that no action was taken because on its face, there was no evidence of fraud.

Lastly, when Castellano reordered a scant number of names, she cc'd Lytle, prompting a side comment from Lytle to the account executive about the crappy mailer who didn't want to spend a lot of money, notwithstanding the profit margin being as significant as it was.  An opinion about a "crappy mailer" and a reference to the high profit margin does not equate to knowledge of fraud. Supp.R9.1525.  To the contrary, it reflects Lytle's belief that the promotion was going out. At worst, and as Lytle testified, it expresses frustration about the client being a cheapskate. *See* Supp.R9.1751-53.  "Criminal prosecution cannot be used to punish those who run promotional schemes to make money simply because some persons are most susceptible to try their luck than a more prudent recipient of the mail.  If purchase by the naïve and imprudent consumer be the test to prosecute promoters, most state and charitable lotteries, as well as promotions using 900 numbers to solicit "lonely hearts," could be criminally liable." *Goodman*, 984 F.2d 235.

Knowledge that some mailers in the industry have been accused of wrongdoing is not evidence that Diamond Dollars was of the same ilk. The evidence is insufficient to establish a scheme to defraud based on false or fraudulent statements, representations or promises. Alternatively, the evidence is insufficient to show Lytle had the requisite knowledge and intent.

5. Palm Beach (Count 9)

Palm Beach was brought to Epsilon by Castellano after the press release. Supp.R9.1061-62. True, it was after Saavoy had been identified as a company of interest by the Department of Justice in its reach out to Epsilon. Supp.R9.1765. No guilt by association here: Castellano was only doing business with people who weren't involved with PacNet. Supp.R9.1065. No evidence that Palm Beach engaged in any fraud. To the contrary, Castellano noted that the offer was unusually high-end. Supp.R20.Exh.319. Palm Beach was an art offer associated with a sweeps wrapper. Supp.R9.1075-76.

The shipment of names to a company where there was no evidence that the company was engaged in any sort of fraud, no evidence of what was false or fraudulent about its advertisement, and no evidence that it even used that advertisement, is insufficient to establish a scheme to defraud. And it is certainly insufficient to establish that Lytle had knowledge of or was complicit in it.

6. National Consumer Division (Counts 8, 12, 13)

52

Lytle signing National Consumer Division, his later inquiry about how things were going, and a subsequent purchase of names served as the basis for Counts 8, 12, and 13, respectively. But no one from NCD testified. No evidence of what statements, representations, or pretenses were false or fraudulent, let alone what made them false or fraudulent. Instead, the jury was left to conjecture that the statements were false or fraudulent without any information about whether NCD delivered its product. Or whether NCD had intended to deceive its consumers – if it had.

From Lytle's reaction to Kessler's congratulatory email, in the light most favorable to the government, one could reasonably infer that Lytle had some concern about the *viability* of the company, not the *legitimacy* of it. Supp.R9.955-56. The account executive keeping the client on a "short leash" - because they didn't have a lot of information about an apparent start-up company - would protect Epsilon if the client was unsuccessful for whatever reason. Supp.R9.1772-73. There was insufficient evidence to establish that NCD was engaged in a scheme to defraud and that Lytle knew it at the time he sent the welcome email (Count 8).

Later, when Lytle learned that notwithstanding NCD's hype about large mailings, NCD wasn't mailing, Lytle commented to the sales team that the "first mailing must have really 'not met their ROI expectations.' Or they went to jail.

It's all the same." (Count 12).  Supp.R9.1777-78; Supp.R11.Exh.42. But this

comment is insufficient to support an inference that he knew that NCD was

engaged in wrongdoing, particularly when evidence of NCD's mailings being

fraudulent is absent from the record.

These arguments, and one other apply to Count 13: the shipment that was

the basis for Count 13 would not have been reasonably foreseeable to Lytle. After

passing on the information that he had obtained from NCD – that they were no

longer mailing - Lytle would have had no reason to think that NCD would be

receiving names in the future. *See* Supp.R11.Exh.42. Lytle did not have direct

dealings with the client, he was not engaged in the day-to-day communications,

and he had been told that NCD was no longer mailing. Not only was there no

evidence of a scheme to defraud, nor Lytle's intent, it would not have been

foreseeable to Lytle that the shipment would occur. Only Kessler, as the VP of

Sales, would have had the ability to stop the shipment. Supp.R9.957. Kessler's

admission of guilt as to the NCD mailing is not substantive evidence that Lytle is

also guilty. *See* Supp.R9.522. Especially so when Lytle was under the impression

that NCD was no longer mailing. And it does not allow for a reasonable

inference of Lytle's guilt. But it was used to create the improper inference that

"birds of a feather flock together."  The evidence was insufficient to support

these Counts as to NCD.

**F. Issue Three: The evidence is insufficient to establish that Lytle knew someone previously in trouble intended to engage in fraud.**

1. Live Tree (Count 11 email)

Count 11 is the July 3, 2017 email Lytle sent to Kessler agreeing to respond to Pisoni's request made to Epsilon in the UK. *See* R11.Exh.41. In the light most favorable to the government, it reflects a willingness to work with someone who previously faced legal troubles. But the email doesn't say that Lytle would sign Pisoni up if he was barred from mailing in the United States. *Id*. It merely says that he would "reach out." *Id*. More telling is Lytle's reaction *after* he had the call with Pisoni. He felt that Pisoni's communication was not for a new business but rather a ruse to get other information. So Lytle reached out, as one would expect, to an Epsilon lawyer who advised that they should have nothing to do with Pisoni. Supp.R9.1787-89. And no further action was taken. Further, Lytle notified the lawyer that Pisoni was on trial in a fraud case. *Id.*; Supp.R21.Exh.Z92. Whether Pisoni intended to operate a scam or a legitimate business, having learned his lesson from his first interaction with the feds is unknown. Whether Pisoni was indeed barred from mailing is unknown. But no contract was signed by Pisoni nor was any creative shared. There is no evidence that Pisoni was operating another scheme to defraud. The evidence showed that Lytle was proactive in notifying legal of his concerns and that he did not sign the client after consulting with the attorney.

As the government pled this case, it was a scheme to defraud based on false and fraudulent promises, statements, and representations.  Absent any evidence of what those false and fraudulent promises, statements, and representations were, there is no evidence of a scheme to defraud.  Would a more prudent business decision have been to not follow up with Pisoni? Of course.  But that doesn't change the fact that there was no evidence of a scheme to defraud.

### G. Issue Four: Where Lytle had no duty to evaluate the promotional material nor the client, and absent knowledge that clients were engaged in a scam, is his conspiracy conviction a result of speculation and conjecture?

Conspiracy is the final count to be discussed because a conspiracy count is usually the government's dragnet.  But at best, the evidence places Lytle in a climate of activity that reeks of something afoul.  *Austin*, 786 F.2d at 988.  Kessler said it best.  When asked if it was common knowledge in the DTC that there were scams, he declines to call the client mailings scams.  "It was common knowledge in the DTC unit that they were deceptive.  It was common knowledge across the entire company that they were deceptive or shady offers in DTC."  Supp.R9.746.  Shady and deceptive isn't enough to support a scheme to defraud.

There was a complete lack of evidence of a scheme to defraud, let alone that Lytle knew at the time of signing the mailers identified in the substantive counts. The same holds true for the remaining mail pieces. Certainly, Lytle

became aware of mailers who were *accused* of wrongdoing after the fact. Much was made about DRC, a mailer signed long before Lytle joined Epsilon. *See* Supp.R9.1163. But even knowledge that DRC had been "shut down" and a mailer being interested in the DRC/Zodiac Zone list does not allow for a reasonable inference that the mailer was engaging in fraud. At most it could be reasonably inferred that the mailer was looking for persons responsive to sweepstakes, not that the mailer didn't have a sweepstakes.

Epsilon could have had better business practices. It could have had a compliance program similar to one that other non-transactional data products had. *See* Supp.R9.1620. But that was a business decision made at a much higher level than Lytle and applied to all business development managers. Clients executed a Master Services Agreement representing that they would comply with all laws, rules, regulations and guidelines. Supp.R9.901-02, 1727. Such an agreement had import - the client was subjecting itself to litigation by a corporate giant if it failed to comply. And while the government's job is to be inherently suspicious, the same is not true of an employee tasked with getting a prospect to join the database before handing them off to an account executive, who would handle the sales. Nor does the fact that some in the industry allegedly broke the rules mean that Lytle knew they all were breaking the rules. Even the government's press release labeled itself as "merely an accusation." *See*

57

Supp.R10.Exh.13. The Government attempted to take its press release describing mailers and brokers accused of wrong-doing and extrapolate that accusation to all mailers who did or contemplated doing business with Epsilon.

The government attempted to take evidence of two mailers - DRC and RDD - who admitted wrongdoing to suggest all mailers in the opportunity seekers category were engaged in a scheme to defraud, that Lytle knew this when he signed them, and that he did so anyway.  DRC was signed before Lytle started working for Epsilon. Supp.R9.1163. RDD was signed early in Lytle's career and there was no evidence that he (nor anyone else) knew it was engaged in a scheme to defraud. *See* Supp.R9.1560-62. Beyond characterizing mail pieces as shady or deceptive, there was no evidence that these advertisements were anything more than potentially misleading.  Mere association with persons accused or later convicted of wrongdoing is not enough to infer that Lytle knew of an agreement to commit mail and wire fraud and with that knowledge, he knowingly and voluntarily joined the conspiracy.

## CONCLUSION

Words in a promotion have to be put in context.  To be false, they must be literally not true.  To be fraudulent, they must be deceptive with the intent to deceive.   In the advertising realm, that requires objective evidence of fraud, not speculation or conjecture merely because a mail piece is sleazy or shady.  Had

each mail piece been analyzed independently, the evidence would have been woefully insufficient to establish a scheme to defraud.  In lieu of objective evidence, the gaps were filled with impermissible inferences of guilt based on Lytle's awareness of persons who had found themselves in trouble and assumptions that because two mailers had admitted guilt, everyone else must have been engaged in a scheme to defraud.  Convictions can only stand on proof beyond a reasonable doubt, not suspicion of guilt.  Here, that's all there was.  This Court should reverse Lytle's convictions based on insufficiency of the evidence.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because the multiple sufficiency claims require close examination of dozens of exhibits.  Oral argument will help this Court analyze the issues in the context of the record on appeal.

Respectfully submitted,

MORGAN PILATE LLC

*/s/ Melanie S. Morgan*
Melanie S. Morgan
926 Cherry Street
Kansas City, MO 64106
Tel: 816-471-6694
Fax:  816-472-3516
e mmorgan@morganpilate.com
*Attorney for David Lytle*

## CERTIFICATE OF COMPLIANCE

I certify that with respect to this document:

(1) all required privacy redactions have been made;

(2) if required to file additional hard copies, that the ECF submission is, with the exception of any redactions, an exact copy of those hard copies;

(3) the ECF submission was scanned for viruses with the most recent version of a commercial virus-scanning program, which is continuously updated, and, according to the program this document is free of viruses; and

(4) this brief is proportionally spaced and contains 12,827 words.

/s/ Melanie S. Morgan
Attorney for David Lytle

## CERTIFICATE OF SERVICE

I certify that on May 2, 2025, I electronically filed Mr. Lytle's Opening Brief

using the CM/ECF system which will send notification of this filing to all parties

of record.

/s/ Melanie S. Morgan
Melanie S. Morgan

**ATTACHMENT A:**

JUDGMENT

AO 245B (CO Rev. 1120) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

District of Colorado

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| DAVID LYTLE | ) | Case Number: 1:21-cr-00192-RM-2 |
| | ) | |
| | ) | USM Number: 50359-509 |
| | ) | |
| | ) | Melanie Susan Morgan |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☒ was found guilty on count(s)   1, 2, 5, 7, 8, 9, 10, 12, 13, 14, 16, 18, 19, 20, 22, 23, 24, 25, 26 and 27 of the Superseding Indictment.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud | 1/1/2018 | 1 |
| 18 U.S.C. § 1343 | Wire Fraud | 6/13/2016 | 2 |
| 18 U.S.C. § 1343 | Wire Fraud | 8/15/2016 | 5 |
| 18 U.S.C. § 1343 | Wire Fraud | 9/8/2016 | 7 |
| 18 U.S.C. § 1343 | Wire Fraud | 9/30/2016 | 8 |
| 18 U.S.C. § 1343 | Wire Fraud | 10/14/2016 | 9 |

   The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☒ Count(s)  3, 4, 6, 11, 15, 17, and 21   ☐ is ☒ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 30, 2024
Date of Imposition of Judgment

_Raymond P. Moore_
Signature of Judge

Raymond P. Moore, Senior United States District Judge
Name and Title of Judge

October 3, 2024
Date

Judgment — Page ___2___ of ___8___

DEFENDANT: DAVID LYTLE
CASE NUMBER: 1:21-cr-00192-RM-2

### ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | 11/14/2016 | 10 |
| 18 U.S.C. § 1343 | Wire Fraud | 4/15/2017 | 12 |
| 18 U.S.C. § 1343 | Wire Fraud | 4/26/2017 | 13 |
| 18 U.S.C. § 1343 | Wire Fraud | 5/12/2017 | 14 |
| 18 U.S.C. § 1343 | Wire Fraud | 7/3/2017 | 16 |
| 18 U.S.C. § 1343 | Wire Fraud | 7/19/2017 | 18 |
| 18 U.S.C. § 1343 | Wire Fraud | 7/28/2017 | 19 |
| 18 U.S.C. § 1341 | Mail Fraud | 6/22/2016 | 20 |
| 18 U.S.C. § 1341 | Mail Fraud | 8/3/2016 | 22 |
| 18 U.S.C. § 1341 | Mail Fraud | 8/23/2016 | 23 |
| 18 U.S.C. § 1341 | Mail Fraud | 8/25/2016 | 24 |
| 18 U.S.C. § 1341 | Mail Fraud | 9/3/2016 | 25 |
| 18 U.S.C. § 1341 | Mail Fraud | 9/3/2016 | 26 |
| 18 U.S.C. § 1341 | Mail Fraud | 9/7/2016 | 27 |

AO 245B (CO Rev. 1/20) Judgment in a Criminal Case

| | Judgment — Page 3 of 8 |

DEFENDANT: DAVID LYTLE
CASE NUMBER: 1:21-cr-00192-RM-2

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **Forty-eight (48) months, on each count, to be served concurrently.**

☒ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends the defendant be designated to the Leavenworth Federal Prison Camp in the District of Kansas.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☒ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☒ By 12 p.m. within ___15 days of designation___ .

☐ as notified by the United States Marshal.

☒ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (CO Rev. 11/20) Judgment in a Criminal Case

Judgment — Page    4    of    8

DEFENDANT:          DAVID  LYTLE
CASE NUMBER:      1:21-cr-00192-RM-2

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **Three (3) years, on each count, to be served concurrently.**

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.
    - ☒  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☒  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (CO Rev. 11/20) Judgment in a Criminal Case

Judgment — Page <u>5</u> of <u>8</u>

DEFENDANT: DAVID LYTLE
CASE NUMBER: 1:21-cr-00192-RM-2

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B (CO Rev. 1/20) Judgment in a Criminal Case

Judgment — Page    6    of    8

DEFENDANT:        DAVID LYTLE
CASE NUMBER:      1:21-cr-00192-RM-2

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a program of cognitive behavioral treatment (CBT) approved by the probation officer and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program as to modality, duration, and intensity. You must pay for the cost of treatment based on your ability to pay.

2. If the judgment imposes a financial penalty, you must pay the financial penalty in accordance with the Schedule of Payments sheet of this judgment. You must also notify the court of any changes in economic circumstances that might affect your ability to pay the financial penalty.

3. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.

4. You must provide the probation officer access to any requested financial information and authorize the release of any financial information until all financial obligations imposed by the court are paid in full.

5. You must apply any monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation in this case.

6. If you have an outstanding financial obligation, the probation office may share any financial or employment documentation relevant to you with the Asset Recovery Division of the United States Attorney's Office to assist in the collection of the obligation.

Judgment — Page ___7___ of ___8___

DEFENDANT:     DAVID LYTLE
CASE NUMBER:    1:21-cr-00192-RM-2

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 2,000.00 | $ 0.00 | $ 10,000.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement    $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒ the interest requirement is waived for the    ☒ fine  ☐ restitution.

    ☐ the interest requirement for the    ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Publ. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: DAVID LYTLE

Judgment — Page 8 of 8

CASE NUMBER: 1:21-cr-00192-RM-2

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of $ _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

    The special assessment and fine obligation are due immediately. Any unpaid monetary obligations upon release from incarceration shall be paid in monthly installment payments during the term of supervised release. The monthly installment payment will be calculated as at least 10 percent of the defendant's gross monthly income.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**ATTACHMENT B:**

ORAL DENIALS OF RULE 29 MOTION

21-cr-192-RM    Jury Trial    05-22-2024

1  stayed close to the co-conspirators and tried to hire them

2  afterwards.  But obviously the Government is advancing a

3  *Pinkerton* theory here that he can be responsible for the acts of

4  others within the conspiracy.

5        Mr. Lytle sent those emails.  Mr. Reger obviously knew

6  him well, was sending him personal emails about law enforcement

7  actions, you know, what to do when legal responded, and in fact

8  responding in emails to discussions about creative where

9  Mr. Lytle was advocating for a scam creative, and Mr. Reger

10  responded saying, okay, good, I think was his response in

11  Exhibit 6.

12        So, for those reasons, Mr. Reger also in the light most

13  favorable to the Government can bear responsibility for each of

14  the wire fraud counts that he was charged with.

15        Your Honor, I think I have addressed all of the

16  arguments, but if I missed one, I would be happy to --

17        THE COURT:  No, you haven't.  Look.  In terms of the

18  general sufficiency, that's overruled.  I think there is

19  sufficient evidence in the light of the standard that's applied

20  to Rule 29 to overcome some -- to overcome the general challenge

21  that has been lodged.  I think there is evidence of the

22  conspiracy.  I think there is evidence of these and others

23  participating in it, and I think the mail fraud and wire fraud

24  counts are supported by evidence as well.

25        Getting into briefly some more specifics, to the extent

21-cr-192-RM    Jury Trial    05-22-2024

1    that counts five and six, for example, refer to -- well, to put

2    it this way, that they're not victim counts, they don't have to

3    be.  They just have to be in furtherance of the fraud scheme.

4    And the fact that it is not a shipment to a victim or something

5    that's more focused on -- well, something that is focused at an

6    earlier or slightly different stage is not a basis upon which to

7    grant a Rule 29 motion unless there's some reason to believe

8    that these wires are not, as the indictment says, for the

9    purpose of executing the scheme.  I understand that there's

10   dispute as to whether or not there is or is not a scheme and who

11   is or isn't a member and all of the rest of it, but again, the

12   decision is on the basis of the standards that are applicable to

13   Rule 29.

14        The same is true with respect to the RDD and the Gold

15   Rush matters.  Without saying as much, it's obvious to me that

16   the Government is relying heavily upon its *Pinkerton* and aiding

17   and abetting theories with respect to some of these matters.

18   And clearly, it is a much, much closer issue for Mr. Lytle as to

19   whether or not he had the intent to defraud necessary for the

20   existence of the mail slash wire fraud schemes at the time.

21        If he did, well, then the subsequent matters that occur

22   are foreseeable, are a part of a continuing conspiracy, and the

23   fact that his piece, if you would, would have been completed or

24   at least his extraction of value, if I could use that as a

25   phrase, may have been completed, does not mean that the intent

21-cr-192-RM    Jury Trial    05-22-2024

1  to -- well, that the scheme to defraud somehow didn't exist or

2  didn't involve him simply because it extends in a continuous

3  manner over time.

4         I grant you that there is an argument, and I have

5  looked at it, which is that the connection between an asserted

6  alleged intent to defraud and events that occur some three,

7  four, five years later, is one that is tenuous, but it is also

8  one that is factually a matter for the jury to decide, and I

9  don't believe that the evidence is such that under the Rule 29

10 standard, it's appropriate for me to take the matter from the

11 jury.

12        So, the Rule 29 motions are denied.  Now, who is going

13 first, if anyone?

14        MR. McGREEVY:  We're going to mix it up a little bit.

15 We will have two, three witnesses that were either -- worked at

16 Epsilon.  Then Ms. Morgan is going to call her client, and then

17 that will certainly take us through the day.

18        THE COURT:  All right.  Look.  Look.  I'm not --

19 there's a couple of things I just want to understand.  I want to

20 understand that I should refer to it slightly differently than I

21 normally would.  Normally I would say, for example, in a

22 multi-defendant case, I think I would start with one defendant,

23 and go, does Mr. So and So intend to put on any evidence?  And

24 then come to the second Mr. So and So, does he intend to put on

25 any evidence after that case is closed.

Appellate Case: 24-1400    Document: 30    Date Filed: 02/04/2025    Page: 195    Restricted

1949

21-cr-192-RM    Jury Trial    05-23-2024

1  renewed for Mr. Lytle as well, but I invite additional

2  statements if you wish to make any.

3           MS. MORGAN:  Do you really invite additional

4  statements?

5           THE COURT:  I do.  Because my afternoon is free.

6           MS. MORGAN:  I echo the motion, and we'll leave it at

7  that.

8           THE COURT:  Okay.  Do you echo what you said

9  previously?

10           MR. READER:  I do.  And given that the evidence is

11  taken in the best light of the defendant -- to the Government, I

12  beg your pardon -- it would be difficult for the additional

13  evidence to change the Court's prior ruling, and in fact the

14  evidence that came forward, taken in the best light to the

15  Government, contributes to the fact that all of the elements to

16  all the counts are met.

17           THE COURT:  I agree.  The renewed motions are denied

18  in all respects.  Let me give you some thoughts.  I will see --

19  first, I will see you to at 10:00.  If anybody wants to be a

20  little more relaxed than having their full-on trial outfit, I'm

21  fine with that.  I'm not saying shorts and cutoffs.  Let's not

22  go that far, but I consider it to basically be an informal

23  proceeding.  I'll have a robe, but I'm not going to be at all

24  concerned if you are less than tied up and dressed up, so to

25  speak.

1958